```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                 Plaintiff,                  :
                                             :
              -against-                      :
                                             :
PITTSFORD CAPITAL INCOME PARTNERS, L.L.C.    :
PITTSFORD INCOME PARTNERS II, L.L.C.,        :
PITTSFORD INCOME PARTNERS III, L.L.C.,       :
PITTSFORD INCOME PARTNERS IV, L.L.C.,        :
PITTSFORD INCOME PARTNERS V, L.L.C.,         :   06 Civ 6353 T(P)
JEFFERSON INCOME PARTNERS, L.L.C,            :
PITTSFORD CAPITAL, L.L.C., PITTSFORD         :   DECISION AND ORDER
CAPITAL MORTGAGE PARTNERS, L.L.C.,           :
PITTSFORD CAPITAL GROUP, INC.,               :
MARK PALAZZO, and EDWARD TACKABERRY,         :
                                             :
                 Defendants,                 :
and                                          :
                                             :
COMMUNICATE WIRELESS, L.L.C,                 :
MONROE WIRELESS, L.L.C., and                 :
MICHAEL LATINI,                              :
                                             :
                 Relief Defendants.          :
                                             :
-------------------------------------------x
```

## INTRODUCTION

The Securities and Exchange Commission ("SEC") commenced this action against defendants Pittsford Capital Income Partners, L.L.C. ("Pittsford I"), Pittsford Income Partners II, L.L.C. ("Pittsford II"), Pittsford Income Partners III, L.L.C. ("Pittsford III"), Pittsford Income Partners IV, L.L.C. ("Pittsford IV"), Pittsford Income Partners V, L.L.C. ("Pittsford V"), Jefferson Income Partners, L.L.C. ("Jefferson") (collectively the "Pittsford Issuers"), Pittsford Capital, L.L.C. ("Pittsford Capital"), Pittsford Capital Mortgage Partners, L.L.C. ("PCMP"), Pittsford Capital Group, Inc. ("Pittsford Group"), (all of the foregoing parties collectively referenced at times as the ("Pittsford Entities"), Mark Palazzo ("Palazzo") and Edward Tackaberry ("Tackaberry")(collectively "defendants") and Communicate Wireless, L.L.C

("Communicate"), Monroe Wireless, L.L.C. ("Monroe Wireless") and Michael Latini ("Latini") (collectively "Relief Defendants"), alleging violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, arising out of the alleged use of investor funds for improper purposes by making secret loans, commingling investor funds without disclosure and other material misrepresentations and omissions.

On July 14, 2006 (the same day the complaint was filed), this Court granted the SEC's application for a temporary restraining order ("TRO") freezing the assets at issue pending a determination of its application for a preliminary injunction. In the same Order, Lucien A. Morin II, Esq., was appointed receiver (the "Receiver") to *inter alia* ascertain the financial condition of the defendants, prevent dissipation of defendants' assets, and preserve records. On July 24, 2006, the Court held a hearing on the SEC's application for a preliminary injunction. Palazzo and Tackaberry did not oppose the entry of the Preliminary Injunction. At the conclusion of the hearing, the Court granted the Order For Preliminary Injunction and Asset Freeze ("Preliminary Injunction"). The Court subsequently entered two orders in August and November 2006 relating to amending the Preliminary Injunction Order and Asset Freeze. On December 1, 2006, the Receiver filed a Preliminary Report of Receiver.

The SEC now moves this Court for an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against Palazzo and Tackaberry: (1) seeking a permanent injunction restraining Palazzo and Tackaberry from future violations of the anti-fraud provisions of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder; (2) ordering

defendants, jointly and severally, to pay disgorgement in the amount of $11,725,294.82, plus prejudgment interest thereon calculated from June 17, 1996, based on their violations of the federal securities laws; and (3) imposing a third tier civil penalty against Palazzo and Tackaberry.

Defendants oppose the SEC's motion on the grounds that it lacks the required burden of proof to establish fraud by the defendants. According to defendants, the proof submitted by the SEC does not comply with the standard necessary for a party to establish a fraud claim in a motion for summary judgment, let alone at trial. Further, defendants argue that the SEC has ignored exculpatory evidence favoring defendants and continue to prosecute a significant claim that is contrary to undisputed evidence. Finally, defendants assert that certain claims argued in the motion for summary judgment include claims that were not asserted in the Complaint, yet the SEC did not amend the complaint to include these additional claims.

The Court has considered thoroughly all of the submissions the parties have made in connection with the instant motion. For the reasons set forth below, the SEC's motion for summary judgment is granted.

<u>**BACKGROUND**</u>

The following facts are undisputed except where specified otherwise.

**A.    The Pittsford Issuers**

Pittsford I was formed by Palazzo[1] and Tackaberry on May 22, 1996 as a New York limited liability company.[2] The Private Placement Memorandum ("PPM") dated June 17, 1996 for Pittsford I offered $2 million in

---

[1] Palazzo was President, Treasurer and Director of Pittsford I, while Tackaberry was Chairman of the Board, Secretary and Director.

[2] Also formed on May 22, 1996 was PCMP. In 1999 and 2000, Pittsford I through V were merged with and into PCMP and PCMP allegedly became the "successor in interest" to Pittsford I through V. At the end of 2000, Palazzo and Tackaberry had closed the separate bank accounts of Pittsford I through V and transferred the funds to the PCMP bank account.

unregistered promissory notes in forty $50,000 units. The Pittsford I promissory notes were to mature ten years from the date of issue.[3] However, after five years note holders could require Pittsford I to prepay subject to the availability of the company funds. The Pittsford I offering raised $2,001,250 from 56 investors. On April 16, 1997, Pittsford II was formed and the PPM offered $3 million in unregistered promissory notes that were sold in sixty $50,000 units. The Pittsford II notes matured five years from the date of issuance although Pittsford II "in its sole discretion" could extend the term of the notes an additional five years. In addition, it was a requirement that Pittsford II "use its best efforts" to redeem notes after five years "on a first come, first served basis." The principal amount became payable at maturity. Pittsford II offering raised $2,423,400 from 50 investors and returned $290,000 in principal to 11 investors.

On February 2, 1998, Pittsford III was formed and pursuant to the PPM, Pittsford III offered $3 million in unregistered promissory notes comprising sixty $50,000 notes. The notes were to mature in five years from the date of issue, although Pittsford II could extend the notes an additional five years "in its discretion." Moreover, it was a requirement for Pittsford III to "use its best efforts" to redeem notes after five years "on a first come, first served basis." The offering for Pittsford III raised $2,691,644.82 from 46 investors and returned $52,095.89 in principal to 11 investors. In the same year, Pittsford IV was formed and the PPM offered the same basic options for investors with the exception of the

---

[3]The interest rate payable on the Pittsford I notes was 10% per year and 11% per year for purchasers of five or more notes.

interest paid per year on the promissory notes.[4] The Pittsford IV offering raised $2,184,250 from 37 investors and returned $513,350 in principal to 12 investors.

In 1999, Pittsford V was formed and the PPM offered $3 million in unregistered promissory notes consisting of $50,000 Series B and Series C notes.[5] Pittsford V note holders may present their notes to the issuer for repayment of principal after one year, which Pittsford V would do but only if it had "sufficient funds." See App. Tab 9. The Pittsford V note holders, as opposed to the issuer, had the right to extend the maturity date an additional five years. The Pittsford V offering raised $4,339,750 from 62 investors and has returned $1,306,918.03 in principal to 22 investors and interest to 16 investors. On July 27, 2004, Palazzo signed a document that purported to extend the maturity of Pittsford I, II, III and V and also authorized Pittsford IV note holders to extend the terms of their Promissory Notes for an additional five years. While the document was signed in July 2004, it was dated as of July 10, 2002. Jefferson was formed on December 30, 2002 as a New York limited liability company. The PPM states that Jefferson offered $6 million in unregistered securities consisting of 120 Class B Units at $50,000 per Unit.[6] The Class B holders were entitled to redeem the Units after one year provided that Jefferson has "sufficient working capital and cash flow, which will be determined by

---

[4]Pittsford III notes paid interest at 10% per year and 12.20% per year to investors who purchased five or more notes. Pittsford IV promissory notes paid interest at 10% per year and 10.5% per year to investors who purchased three or more notes.

[5]The Pittsford V Series B notes paid interest at 10% per year, or 11% if five or more notes are purchased or 10.5% per year to investors who purchased three or four such notes. The Series C notes pay interest at 9% per year, or 10% if five or more notes are purchased, and 9.5% if three or four such notes are purchased.

[6]The Class B holders were entitled to net income allocations between 7% and 12% depending on the amount of money invested and at the "sole discretion" of Palazzo and Tackaberry.

[Jefferson] in its sole discretion." While the Jefferson offering raised $1,865,000 from 19 investors, it did not return any money to investors.

**B.    The Private Placement Memoranda**

Each of the PPMs for Pittsford I through V and Jefferson indicate that their business would be to acquire and hold notes secured by mortgages on real property. For example, the PPM for Pittsford I stated in pertinent part that "[t]he Company shall engage in the business of acquiring and holding notes secured by mortgages on real property." Similar language is found on the other PPMs for Pittsford II through V and Jefferson. In essence, the PPM stated that investor funds would be used only to acquire notes secured by mortgages on real property. The PPM for Pittsford I, similar to the other PPMs, states that "Interest on the Notes will be paid from [Pittsford I's] operating capital" and "[p]rincipal on the Notes will be paid from the collection of the notes secured by mortgages held by [Pittsford I]." Accordingly, the PPMs for Pittsford I through V make clear that each of them was to keep its funds separate.

Defendants state that except for Jefferson's PPM, none of the other PPMs for Pittsford I through V specifically prohibited merger of the companies. In addition, the Operating Agreement of Jefferson stated that "[t]he Company's funds may not be commingled with the funds of any Manager, Member, Officer or any Affiliate thereof." Notwithstanding the language of these agreements, Pittsford III, IV and V merged into PCMP in August 2000. The note holders were not asked to provide their consent before the merger, even though a letter discussing the proposed merger stated that "[i]n order to merge the entities, the written majority consent of the members is required." In fact, James Jenkins of the Harter Secrest law firm, who represented Pittsford I through V in connection with the merger into PCMP,

never advised Palazzo and Tackaberry that the assets of one Pittsford Capital Income Partner could be used to pay off the liabilities of another, nor did either defendant seek advice from their attorneys regarding this issue.

Further, Palazzo and Tackaberry note that each PPM for Pittsford I through V and Jefferson stated that due to the nature of mortgage lending, the offerings were highly speculative and involved a high degree of risk. Accordingly, to qualify as an investor, a person not only had to be a person of high income or high net worth but he/she must essentially be a sophisticated investor. The SEC asserts however, that any cautionary language in the PPM did not disclose the risks that arose from Palazzo and Tackaberry's decisions to make millions of dollars in unauthorized loans, fail to disclose defaults and commingle funds.

**C. Commingling of Funds**

Palazzo and Tackaberry eventually combined all the Pittsford Issuers bank accounts into the PCMP's M&T bank account in 2000 (hereinafter "PCMP's 101 Account"). This commingling of investor funds from the Pittsford Issuers occurred between January, 1999 through September 1999.[7] On March 20, 2000, Palazzo wrote investors that "as members and the manager of Pittsford Capital Mortgage Partners, LLC, we believe that it is in the best interests of the company and its other members to merge each of [Pittsford III, Pittsford IV and Pittsford V] with and into the Company. Once the

---

[7]Pittsford III's bank accounts transferred approximately 4,963,140.63 to PCMP's accounts and the bank accounts of PIP IV and PIP V, while PIP III's accounts received approximately $6,737,037.90 from PCMP's accounts and the bank accounts of Pittsford IV and Pittsford V. In addition, Pittsford IV's bank accounts transferred about $2,496,186.47 to PCMP's accounts and the bank accounts of Pittsford III and V, while Pittsford IV's accounts received about $1,406,539.33 from PCMP's accounts and the bank accounts of Pittsford III and V. Further, Pittsford V's bank accounts transferred approximately $2,080,345.79 to PCMP's accounts and the bank accounts of Pittsford III and Pittsford IV, while Pittsford V's accounts received about $152,777.55 from PCMP's accounts and the bank accounts of Pittsford III and V.

[Pittsford V] offering is completed, we will begin the merger process to combine all of the 'Income Partner' companies into a single entity." See 7/14/06 Debella Decl. However, investors in the Pittsford Issuers were not informed that all the Pittsford Issuers' bank accounts had been merged into a single bank account. Moreover, Roehrig[8] stated that Jefferson loaned money based on real estate collateral and that when he solicited investors he told them that Jefferson would invest in real estate loans exclusively. In a letter from Palazzo to investors in September 2003, he stated that there had been a "'loan' of $980,000 from Jefferson ..., an affiliated mortgage fund, to PCMP." See 7/14/06 Debella Decl. Moreover, another letter in April 2005 from Palazzo to investors indicated that Jefferson lent PCMP $1.8 million.[9] See id. In sum, Pittsford III, IV, V and Jefferson transferred approximately $10,261,238 to PCMP's accounts.

### D.    Transfers of Funds to Communicate Wireless

In July 2003, Latini[10] initially approached Palazzo and Tackaberry for a loan to Communicate in the amount of $850,000 for use in acquisitions, inventory and working capital. The loan amount was increased $100,000 in August 2003. Meanwhile the only mortgage security providing collateral for the loan was given by Latini and his wife who executed a second mortgage in favor of PCMP on their residence for $100,000 on July 31, 2003.[11] In essence, the 2003 PCMP loan was secured by personal guarantees of Latini

---

[8]Stephen Roehrig is an employee of Monroe Wireless ("Monroe"), which was formed on February 8, 2006.

[9]Between June 19, 2003 and January 5, 2005, Jefferson transferred $1,775,000 to PCMP's accounts, and between October 31, 2003 and February 6, 2006 Jefferson received $547,009.28 from PCMP's accounts.

[10]Michael Latini was the founder of Communicate Wireless, which was formed on October 15, 2002.

[11]Notably, the $100,000 mortgage interest in the Latini home did not offer any security to PCMP since the home already was mortgaged beyond its appraised value. First, the Latini home already had a $179,000 mortgage and a $50,000 home equity line of credit, which Latini had used to start Communicate.

and a security agreement with Communicate. Communicate eventually repaid the loan to PCMP in February 2005. Upon repayment of the loan, Latini started negotiations with Palazzo and Tackaberry for a bridge loan to be used for funding of additional stores and expand their operations.[12]

In February 2005, Palazzo (on PCMP's behalf) and Latini (on Communicate's behalf) executed a term sheet for recapitalization of Communicate whereby PCMP was to provide $2 million to Communicate. Notably, as a condition to the loan, both Palazzo and Tackaberry demanded that they each personally receive a 20% equity interest in Communicate. In addition, Palazzo and Tackaberry insisted that part of the recapitalization should include Communicate renting office space at 170 Office Park Way, the same location where PCMP had its offices. Due to this transaction, Palazzo became Communicate's Chief Financial Officer and Tackaberry became Communicate's Vice-President for Marketing.[13] In April 2005, Palazzo, on behalf of PCMP, signed a discharge of Latini's no-equity mortgage making PCMP's 2005 loan to Communicate unsecured by any mortgage. Moreover, on April 19, 2005, Palazzo, on behalf of PCMP, accepted and executed a Promissory Note from Communicate for $2,195,050.96 (the "April 19 2005 Note"). Communicate used funds from the April 19, 2005 Note to pay back a $1.3 million loan from M&T bank including interest payments and fees for extending the term of the promissory note.

Further, on July 13, 2005, Latini and Palazzo, on behalf of

---

[12]According to defendants, around the same time as the negotiations for the bridge loan, Communicate met with CapSources regarding the possibility of a debt investment. Communicate was seeking three to five million dollars in investment money from CapSources and Capsources appeared to be interested in investing in Communicate. Defendants assert that Latini informed Palazzo and Tackaberry about his meeting with CapSources and that Communicate planned to obtain a bridge loan from Pittsford I through V and repay with the proceeds from the financing by CapSources or another investor within six months.

[13]In April 2005, the percentage of ownership for Communicate was as follows: 55% Latini, 20% Palazzo, 20% Tackaberry and 5% Gary Weston.

Communicate, signed a promissory note to PCMP, which was also executed by Tackaberry, on behalf of PCMP, for $2,472,000, which included additional loans, interest and fees from the $2,195,050.96 loan Communicate borrowed from PCMP on April 19, 2005.[14] It is noteworthy that Communicate never paid back any of the principal of the July 13, 2005 promissory note, only interest. Moreover, on September 6, 2005, Latini executed a Promissory Note to pay PCMP $52,960, which was accepted by Tackaberry on behalf of PCMP. The September 6, 2005 Promissory Note does not identify a mortgage, or any collateral, to secure PCMP's loan. During the same time in September, Communicate issued two stock certificates for PCMP, which were signed by Palazzo as President of Communicate[15] and Latini as Chief Executive Officer. In addition, on September 6, 2005, Tackaberry signed a "Pay-Off Confirmation Letter" on behalf of PCMP certifying that the conversion of PCMP's $2,472,000 loan into equity units, combined with a $115,960 payment of principal, constituted "payment in full of the total outstanding indebtedness and liabilities owed by Communicate" to PCMP. See App. Tab 62, at PITT 29542. Accordingly, Palazzo and Tackaberry exchanged for equity the money invested with PCMP to be used expressly for lending activity. Thus, there was no disclosure to PCMP's investors that their loans had been converted into equity in Communicate.[16] In total, from period 2003 to 2005, Palazzo and Tackaberry transferred $2,349,998.80 from PCMP's account to

---

[14]As of July 11, 2005, the percentage of common unit ownership was as follows: Latini 55%, Palazzo 40% and Weston 5%. PCMP held all Series A and Series B Units.

[15]Under a November 4, 2005 Separation Agreement, Tackaberry assigned his ownership interests in Communicate to Palazzo.

[16]By April 4, 2006, Palazzo assigned his shares back to Communicate and withdrew as a member of Communicate. Accordingly, the ownership of the common units of Communicate, which by April 2006 was merged into Monroe Wireless, was Latini 91.71%, Weston 8.3% and PCMP 0%. At that time, PCMP held all Series A and B Units. However, at the time PCMP and Communicate converted the debt Communicate owed to PCMP to equity, Palazzo was both principal of PCMP and Communicate's CFO.

Communicate and Communicate transferred $1,545,257.38 to PCMP. However, Palazzo and Tackaberry never disclosed the loans to Communicate by PCMP to investors in the Pittsford Issuers.

The SEC has proffered undisputed evidence that Palazzo and Tackaberry did not inform any of the investors of the Pittsford Issuers that they loaned investor funds to Communicate and that those funds were not secured by a mortgage. In addition, Palazzo and Tackaberry did not disclose that they were equity owners and officers of Communicate. In fact, neither Palazzo nor Tackaberry informed Latini that they had told PCMP's investors or obtain their consent before making a loan to Communicate. Tackaberry also did not disclose the loan to Communicate to investors. Instead, in a letter to investors, Tackaberry stated that "a loan made last year to a local company left our fund very weak. They were unable to provide a repayment for monthly interest and principal and thus defaulted." See App. Tab 173, at 2. Further, Palazzo and Tackaberry did not disclose that Palazzo left PCMP to work at Communicate in spite of the fact that PCMP lent investors' money to Communicate.[17]

Defendants argue that nothing in the PPM prohibits loans to companies in which Palazzo and Tackaberry held an interest since the PPMs specifically noted that defendants had conflicts of interest with the Pittsford Entities and through the defendants' affiliated companies.[18] Moreover, defendants argue that the Pittsford Entities made hundreds of

---

[17]Tackaberry wrote the following to PCMP investors in September 2005, "I have recently taken over management of the fund from Mark Palazzo. Mark has elected to move on to a new venture outside of Pittsford Capital." Further, Tackaberry wrote to Jefferson investors, "I have recently taken over management of the fund from Mark Palazzo. Mark has elected to move on to a new venture outside of Pittsford Capital."

[18]The Jefferson PPM specifically states "There are no restrictions on lending activities where the obligor is an affiliate of the Manager." See PPM for Jefferson at 18, Tab 11. Moreover, Jefferson was not merged into Pittsford I through V, but Jefferson could and did lend funds to those companies.

loans over eleven years and only five (four while Palazzo was still affiliated with the entities) could be characterized as loans that were not secured principally by real estate mortgages.[19]

### E.    Transfers of Funds to Monroe Wireless

When Roehrig sought a telecommunications franchise for Monroe, he filled out an application in which he stated "outside funding will provide capital for operations." Tackaberry informed him that the funding would come from PCMP. As a result, PCMP transferred funds four times to Monroe between March 2006 and May 2006. In March 2006, Tackaberry authorized two transfers from PCMP's 101 Account to Monroe totaling $50,000. In April 2006, Tackaberry signed a check drawn from PCMP's 101 Account made payable to Monroe in the amount of $100,000. Finally, in May 2006, Tackaberry signed another check drawn from PCMP's 101 Account to Monroe for $10,000. Throughout all these transactions, neither Palazzo nor Tackaberry disclosed the loans to Monroe by PCMP to investors in the Pittsford Issuers.

### F.    Monroe Acquires Communicate's Assets and Liabilities

On March 23, 2006, Roehrig, on behalf of Monroe signed a purchase agreement that provided for Monroe's acquisition of the assets and liabilities of Communicate. The agreement was also signed by Latini, on behalf of both Communicate and Direct Technologies and Tackaberry, on behalf of PCMP, as an owner of Communicate and on behalf of PCMP individually. The purchase price was the assumption by Monroe of all liabilities of Communicate amounting to $1,611,000 and certain future obligations. As a result, PCMP's equity interest in Communicate was converted into equity in Monroe. Further, according to Roehrig, he was

---

[19]According to defendants, the Pittsford Entities made money on three of these loans and lost money on one while Palazzo was affiliated with the entities.

unaware of Tackaberry ever communicating to investors that PCMP invested in Monroe. <u>See</u> App. Tab 22, at 22:8-11. Moreover, in March 2006, Tackaberry executed, on behalf of PCMP, a Release whereby Communicate released any and all claims it had against Monroe. In addition, on the same date, Palazzo personally executed a Release where he released any and all claims he had against Communicate.[20] Thus, as of August 2006, Monroe had $3,754,561.98 in assets and $3,765,799.97 in liabilities. Monroe's assets consist of the conversion of PCMP's loan to equity and other debt to equity conversions.

G.    **Transfers of Funds to Wireless Supply LLC**

Wireless Supply, LLC ("Wireless") was formed on November 9, 2004 by Palazzo, Tackaberry and Latini. The purpose for forming Wireless was to purchase inventory and sell the inventory to Communicate earning commissions which were paid to Palazzo, Tackaberry and PCMP.[21] On November 23, 2004, Latini, on behalf of Wireless, signed a Promissory Note to PCMP for $350,000. On the same day, Palazzo executed a check drawn from PCMP's 101 account made payable to Communicate for $350,000, which Communicate deposited in its account. Once again, Palazzo and Tackaberry did not disclose PCMP's loans to Wireless to investors in the Pittsford Issuers.

H.    **Guarantees by PCMP for the Benefit of Communicate**

On April 1, 2006, Tackaberry, on behalf of both PCMP and himself personally, Latini, on behalf of Communicate and Roehrig, on behalf of Monroe signed a lease assignment transferring Communicate's lease at The Mall at Greece Ridge from Communicate to Monroe. Tackaberry made the

---

[20]Approximately $224,000 that was allegedly owed to Palazzo by Communicate was converted into equity in Monroe and PCMP and Palazzo guaranteed liabilities to the Pine Investors, who had invested in Communicate.

[21]Latini, on behalf of Communicate and Palazzo, on behalf of Wireless, executed a Consignment Agreement on January 1, 2005 in which Communicate agreed to sell on consignment cellular phones and accesory items that Wireless purchased from Communicate. Wireless never had physical possession of inventory. Rather, Communicate ordered and received the inventory.

decision that PCMP would guarantee the lease for the store at The Mall at Greece Ridge. However, Tackaberry's signature as guarantor to a lease on behalf of PCMP for the benefit of Monroe, was an activity not authorized in any of the PPMs. Moreover, on June 8, 2006, The Mall at Greece Ridge sent a Notice of Default to Monroe informing Monroe that $11,094.73 was owed. Because PCMP guaranteed the lease for Monroe at the Mall at Greece Ridge, PCMP has been named, together with Monroe, Communicate and Tackaberry, as defendants in an action in New York State Supreme Court entitled <u>Greece Ridge, LLC v. Monroe Wireless, et al.</u> The complaint alleges that Greece Ridge, LLC, which owns the Mall at Greece Ridge, is owed $180,785 in back rent. This state court action, which is currently stayed, was brought to collect alleged unpaid rent from Monroe, which PCMP guaranteed. More importantly, investors in the Pittsford Issuers were not told that PCMP had guaranteed a lease obligation for the benefit of Monroe.

## I.    Transfers of Funds to Kanoodle.Com, Inc.[22]

Kanoodle did not own any real property or mortgages and at first Tackaberry informed Keating that he could not lend money to Kanoodle because his fund was for individuals who needed money for real estate or a mortgage. However, Tackaberry changed his mind and told Keating he could loan to Kanoodle if Kanoodle's assets could be secured. Keating informed Tackaberry that the loan could be secured with computer servers. He also told Tackaberry that he wanted to buy computer equipment worth several hundred thousand dollars. In response, Tackaberry asked Keating to send him an equipment list. On August 5, 2002, Keating executed a promissory note with Pittsford Capital for $212,000 at an interest rate of 16% annually.

---

[22]Similar to Google, Kanoodle is an internet search engine where advertisers pay to be listed under key words when a user conducts a search. Kent Keating is the founder of Kanoodle and was President and CEO until November 2004 when he became Chairman. Kanoodle is located in Getzville, New York.

The loan was collateralized by $210,661 of new computer equipment, which Tackaberry knew Kanoodle intended to use immediately. On the same date, Palazzo signed a check drawn from PCMP's 101 Account made payable to Kanoodle in the amount of $66,000. The check merely indicated "equipment loan pt 1." Tackaberry signed another check drawn from the same account payable to Kanoodle in the amount of $90,000 on August 20, 2002, which check indicated "equipment loan pt 2." However, in October 2003, Kanoodle and Tackaberry, on behalf of Pittsford Capital Group, Inc.[23] canceled the $212,000 Promissory note and executed a Replacement Note for $156,000 at an interest rate of 16% per year for the purported reason that the amount on the $212,000 Note was incorrect. The same collateral was pledged.

In April 2003, negotiations between Keating and Tackaberry resulted in Kanoodle receiving a Promissory Note for $300,000 at an interest rate of 16%. The security for the April 30, 2003 Promissory Note was equipment, which Keating said Tackaberry knew would be used by Kanoodle. The Promissory Note was not secured with a mortgage on real property. In addition, Tackaberry informed Keating that he could not loan money to Kanoodle unless there was an asset to secure the loan. As a result, Kanoodle pledged, as collateral, $490,482.62, the full value of certain computer equipment it bought with proceeds from the loan. Accordingly, PCMP's 101 Account wired $300,000 on April 30, 2003 to the Key Bank account of Kanoodle. Further, Tackaberry purchased 10,000 shares of Kanoodle on September 14, 2004. Notably, the funds for this purchase came from PCMP's 101 Account. Thus, between August 2002 and September 2004, Palazzo and Tackaberry transferred approximately $506,000 from PCMP to Kanoodle and

---

[23]Pittsford Capital Group, Inc. ("Pittsford Group") was formed on September 1, 1994. Pittsford Group is a holding company for a number of entities, including PCMP, and Pittsford Capital.

Kanoodle sent about $505,467.70 back to PCMP.

**J.    Loans Made to International Manufacturing Solutions**

On September 17, 2004, PCMP lent $900,000 to International Manufacturing Solutions Corp. ("IMS") so that it could buy assets from Electrolux. PCMP, in contravention to the requirements of the PPMs, accepted as collateral the plastic injection molding equipment IMS was purchasing instead of a mortgage. Palazzo executed, on behalf of PCMP, an agreement with IMS and Electrolux assigning all of the rights of IMS under the purchase agreement to PCMP. Further, Palazzo and Tackaberry each earned a $5,000 fee on an unauthorized loan made to IMS. From September 2004 through April 2005, Palazzo and Tackaberry transferred $1,445,508.34 to IMS and during the same period, IMS transferred $1,611,784.90 back to PCMP.

**K.    Servicing Agent**

In 1996, Palazzo and Tackaberry asked James E. Morris ("Morris")[24] if he was interested in acting as a Servicing Agent for Pittsford I to Pittsford V. Letter agreements were signed by Morris to act as Servicing Agent for Pittsford I to Pittsford V starting in 1996. The Servicing Agent's fee was to be $700 a year for each company. The last payment Morris received was on July 5, 2001 for $700 from Pittsford Capital. The PPMs for Pittsford I to Pittsford V stated in relevant part that the "Servicing Agent" would receive reports from the issuers as to its performance and the issuers were required to "provide prompt written notice to Note Holders upon an Event of Default." See 7/14/06 Debella Decl. at Tab 2 at 11. In this regard, Morris believed he would receive an annual report from the

---

[24]Morris has been a member of the firm Morris & Morris since 1967, part-time Assistant District Attorney for Monroe County from 1968 to 1972, the Brighton town Justice from 1972 to 2005 and an Acting City Court Judge for the City of Rochester from 1977 to 2005.

Pittsford entities and he would be immediately advised of any defaults.[25]

In 2002, Morris received letters from investors requesting redemptions on their promissory notes. Morris told Palazzo that he wanted financial reports and a list of investors. However, he never received any of this information. Palazzo merely told Morris that the redemptions would be honored. In addition, Morris never received notice from Palazzo that Pittsford Issuers had merged into PCMP and that Palazzo had left PCMP. Further, Morris attempted to get in touch with Tackaberry concerning investor complaints but Tackaberry did not return his calls. Morris' ability to act on behalf of investors was hindered because Palazzo and Tackaberry were not providing him with investor information. In fact, Morris submitted an affidavit in an action entitled <u>Hoeve Living Trust et al v. Pittsford Capital Mortgage Partners et al.</u>, wherein Morris states that he did in fact request the names and addresses of all note holders on many occasions from PCMP but received no response. Palazzo also filed an affidavit in the <u>Hoeve</u> litigation where he claimed that the plaintiffs failed to contact Morris before bringing the action as required by the promissory notes.

**L.     Failure to Disclose Defaults and Judgments Against the Pittsford Issuers**

Three of the Pittsford Issuers' investors brought actions in New York state court against PCMP in May 2005 for defaulting on their promissory notes and subsequently received judgments totaling over $280,000. To enforce these judgments, PCMP's bank account was frozen during September and October 2005. On September 20, 2005, Tackaberry informed investors that

---

[25]The PPMs state that a default occurs when: (a) payments of principal were not made 30 or 45 days after their due date; (b) Pittsford I-V made an assignment for the benefit of creditors; (c) a bankruptcy proceeding was brought against Pittsford I-V as a debtor; and (d) a trustee, receiver, agent or custodian was appointed to take charge of substantially all of the property of Pittsford I-V to enforce a lien against the property for the benefit of creditors.

he was working on a "lien being placed on our investor distribution account." A few days later, Tackaberry wrote to PCMP investors that "[w]e just received news that we have obtained a $1 million line of credit and the deal is set to close in a few days. At that time, all claims will be resolved and the lien will be lifted from our account." On September 30, 2005, Tackaberry wrote to Jefferson investors that, "one of the many items I have been working on involves a lien being placed on our investor distribution account since your August distribution check paid on September 1, 2005 ... Rest assured that we are working diligently to reverse the lien and process our distribution check as soon as possible." In October 2005, Tackaberry informed PCMP investors that he signed a "term sheet for a loan commitment on a deal that will provide additional liquidity into the fund. The first order of business is to satisfy the requirements of the lien and get it lifted from our account." During this time period, both defendants failed to disclose the default judgments against the Pittsford Issuers.

### M.    Failure to Disclose Prior Bankruptcy Involvement

The PPM for Pittsford I and II disclosed that Tackaberry was CEO and Chairman of the Board of SandBox Partners, L.P., doing business as Spike's Indoor Beach Volleyball, ("Spike's"), which filed for bankruptcy. The PPMs for Pittsford III through V did not disclose this information.

### N.    Failure to Return Principal and Interest to Investors

In September 2005, Tackaberry informed PCMP investors that the fund experienced some losses and interest and as such distributions may start to differ on a monthly basis depending on the availability of the funds. On February 1, 2006, Tackaberry wrote to investors that interest payments were going to stop and "the check you will be receiving in the next 2-3 days will be considered payment on principal." See 7/14/06 Debella Decl.

18

Accordingly, investors did not receive payments after February 2006 and in fact some investors stopped receiving interest payments and never received return of principal on their promissory notes earlier than February 2006. Approximately $11,050,294 is owed to investors of the Pittsford Issuers in interest and principal on their promissory notes.

Defendants assert that the Pittsford Entities operated as planned for several years. Defendants cite to the Receiver's Preliminary Report and state that "[f]rom the Receiver's review, it appears that things proceeded during the period 1996 through 1999 in due fashion. During that time period, the Issuers proceeded with raising funds in accordance with each PPM and were investing in various mortgage loans." However, most of the questionable transfers began on or after 1999. The SEC argues that Palazzo and Tackaberry made substantial transfers of funds to themselves from the PCMP bank account and the records also indicate payment of funds by Palazzo and Tackaberry to PCMP.

### O.   Reliance on Fifth Amendment Rights

The SEC deposed both Palazzo and Tackaberry in October 2006. The SEC asked them questions regarding the offerings by, and management of, the Pittsford Issuers, including but not limited to the unauthorized loans to Communicate and other entities, the commingling of the Pittsford Issuers' bank accounts, statements in the PPM's regarding the Servicing Agent and the failure to disclose defaults. Both Tackaberry and Palazzo asserted their Fifth Amendment right against self-incrimination in response to the SEC's inquiries. In addition, notwithstanding the Preliminary Injunction Order's requirement that each of the defendants file and serve "verified written accountings," Tackaberry's Verified Written Accounting states that he "refuses to respond to this inquiry" and exercised his rights under the

Fifth and Eighth Amendment to the U.S. Constitution. The SEC also deposed Paul Adams ("Adams")[26] to learn of his knowledge, participation and involvement in Pittsford I, II and III. Adams relied on his Fifth Amendment right as well in response to plaintiff's inquiries.

On November 1, 2006, the SEC sent a letter to the Court notifying Palazzo and Tackaberry that the SEC "intends to request an order precluding [both defendants] from testifying or offering evidence at the summary judgment stage or at trial, based on their refusal to testify and assertion of their Fifth Amendment rights in their depositions."

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c). Summary judgment shall not be granted "if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact 'such that a reasonable jury could return a verdict for the nonmoving party.'" See Green v. Harris Publ'ns, Inc., 2004 WL 1810569, *4 (S.D.N.Y. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)).

The burden is initially on the moving party to show the absence of a genuine issue of material fact. See Am. Home Assurance Co. v. Zim Jamaica, 296 F.Supp.2d 494, 498 (S.D.N.Y.2003). "Once the moving party discharges its burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing

---

[26]Adams was the sole principal, officer, director and shareholder of Monroe Capital.

that a genuine issue for trial exists." <u>See</u> <u>Am. Home Assurance</u>, 296 F.Supp.2d at 498-99. However, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." <u>See</u> <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir.2002) (internal citation omitted). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." <u>See</u> <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir.1993).

## II.   <u>SEC's Claims that Palazzo and Tackaberry Violated the Antifraud Provisions of the Federal Securities Laws</u>

The SEC asserts that Palazzo and Tackaberry engaged in a fraudulent scheme in violation of Section 17(a) ("Section 17(a)") of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) ("Section 10(b)") of the Exchange Act ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 ("Rule 10b-5") promulgated thereunder, 17 C.F.R. § 240.10b-5. Section 10(b) "prohibits the direct or indirect employment of manipulative and deceptive devices in connection with the purchase or sale of securities, using the mails, instruments of interstate commerce, or any facility of a national securities exchange," and is enforced through SEC Rule 10b-5. <u>SEC v. Softpoint, Inc.</u>, 958 F.Supp. 846, 862 (2d Cir.1997). "To have violated Section 10(b) and Rule 10b-5, [a defendant] must have: (1) made a material misrepresentation or omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir.1999).

Section 17(a) "is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate

commerce." <u>Softpoint, Inc.</u>, 958 F.Supp. at 861.[27] The standard for a violation of Section 17(a)(1) is essentially the same as it is for a violation of Section 10(b) and Rule 10b-5, although no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3). <u>Id.</u>; <u>Aaron v. SEC</u>, 446 U.S. 680, 697 (1980); <u>SEC v. First Jersey Sec. Inc.</u>, 101 F.3d 1450, 1467 (1996).

### III.   <u>The SEC's Contention that Palazzo and Tackaberry Made Material Misrepresentations and Omissions</u>

"For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" <u>Castellano, v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 180 (2d Cir. 2001) (<u>quoting</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32, (1988) (internal quotation omitted); <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976). Misrepresentations and omissions are material as a matter of law if they involve facts that are "so obviously important to [a reasonable] investor, that reasonable minds cannot differ on the question of materiality." <u>See</u> <u>TSC Indus.</u>, 426 U.S. at 450. (omitting internal quotations). Defendants Palazzo and Tackaberry argue that there is no question that they gave "full disclosure of the investment objective and risks to their investors with regard to each Pittsford Company, at the time that the respective PPM ... was made." <u>See</u>

---

[27]Section 17(a) provides as follows: It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. <u>See</u> 15 U.S.C.A. § 77q(a) (West 2004).

Def's Br. at 18. However, as the SEC points out, the PPMs did not properly disclose the risks of the defendants' fraud.[28]

As the defendants themselves indicate, each PPM stated that due to the nature of mortgage lending, the Pittsford and Jefferson offerings were highly speculative and involved a high degree of risk. However, this cautionary language in the PPM did not disclose the risks that arose from Palazzo and Tackaberry's decisions to make millions of dollars in unauthorized loans, fail to disclose defaults and commingle funds. Consequently, the cautionary language does not shield the defendants from liability because the risks that were disclosed were not the risks that harmed the investors. See Hunt v. Alliance North Am. Gov't Inc. Trust, 159 F.3d723, 727-28 (2d Cir. 1998). Moreover, each of the PPMs represented that investor funds would be used to acquire notes secured by mortgages and the investors relied on these representations. Any disclosures concerning "related party transactions" and "loans to affiliates" did not put the investors on notice that Palazzo and Tackaberry would allocate more than $4.4 million of the $15.5 million total raised in a series of undisclosed loans that were not secured by mortgages and thus contrary to the terms of the PPMs.

The SEC has proffered evidence that Palazzo and Tackaberry did not disclose numerous transfers of funds from the Pittsford Issuers and/or PCMP to other entities. For instance, it is undisputed that defendants did not advise any of the Pittsford Issuers' investors that they loaned investor funds to Communicate and that those funds were not secured by a mortgage. Any reasonable investor would deem it material to know that Palazzo and

---

[28]Defendants assert that there was proof in the PPMs that show that investors were adequately warned of the risks of their investments, namely: general cautionary language as to the riskiness of the offerings; and a statement in each PPM permitting "loans to affiliates of defendants." See Def. Stmt. of Facts ¶¶ 5-9.

Tackaberry were loaning investor funds to an entity like Communicate. Further, the SEC proffered evidence, not refuted by the defendants, that Palazzo and Tackaberry did not disclose the loans to Monroe Wireless and Wireless Supply by PCMP to investors in the Pittsford Issuers.

In addition, the SEC has proffered evidence that Palazzo and Tackaberry commingled funds for more than seven years. The defendants admit that they commingled funds, but claim that "the investors approved the merger by signing Consents." Defs. Stmt. of Facts. ¶4. In support of their argument, defendants include a document attached as Exhibit A to Michele Bolognesi's Affidavit. However, the document does not show that the Pittsford I through V investors consented to the merger and the subsequent commingling of funds. While it contains the signatures of Palazzo, Tackaberry and 17 individual members of PCMP, none of the 17 PCMP members signed as Pittsford Issuers investors. A review of the investor list indicates that 11 of the 17 signatories were also Pittsford Issuers investors. However, more than 200 people invested in the Pittsford 1 through V offerings and this document shows that only 11 out of more than 200 investors, less 5% of the total, consented to the merger. Thus, defendants' claim that the "investors" approved the merger by signing consents is dubious, at best.

Further, while Palazzo and Tackaberry disclosed the merger of the Pittsford Issuers into PCMP, they never disclosed that the separate bank accounts of the Pittsford Issuers had been closed and all funds commingled into one single account. The merger did not purport to modify any of the terms of the PPMs and each of the PPMs clearly stated that all principal and interest for each Pittsford Issuer offering would be paid from proceeds

of that particular offering.[29] As to whether these omissions and misstatements satisfy the materiality requirement of Rule 10b-5, "there must be a substantial likelihood that a reasonable investor would consider the information important in his decision-making process." See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 185 F.Supp.2d 389, 399 (S.D.N.Y. 2002) In view of the PPM's prohibition of commingling, any investor would view it as material that Palazzo and Tackaberry were perennially commingling funds. See SEC v. Murphy, 626 F.2d 633, 638 (9th Cir. 1980) (Court affirmed judgment in an offering fraud case in part because the issuer did not disclose that it was "commingling the funds from the various partnerships."); see also SEC v. Brooks, 1999 WL 493052, *2 (N.D. Tex. 1999) (granting preliminary injunction in offering fraud case, in part because "defendants commingled funds").

Even when viewing the facts in the light most favorable to defendants, the Court concludes that a reasonable investor would have considered important the fact that defendants did not disclose various transfers of funds to and from the PCMP bank accounts, commingled funds, and failure to disclose default judgments.

**IV.   Whether Defendants' Material Misrepresentations and Omissions Were Made in Connection With the Purchase and Sale of Securities**

Since section 10(b) and Rule 10b-5 have always been viewed as "catchalls to prevent manipulation and misrepresentation ..., courts have liberally construed the requirement that violative conduct must occur 'in connection with' the purchase or sale of a security." Softpoint, Inc., 958 F.Supp. at 862. (internal citations and quotation marks omitted). To

---

[29]Palazzo and Tackaberry assert that the investors should have figured out that their funds were being commingled based on the definition of "merger" to the average sophisticated investor. However, defendants have presented no evidence in support of this proposition.

establish that a scheme to defraud satisfies the "in connection with" requirement, "[i]t is enough that the scheme to defraud and the sale of securities coincide." SEC v. Zandford, 535 U.S. 813, 822 (2002). Here, the SEC has proffered evidence that the offer, purchase, or sale of securities that were made to investors and prospective investors were designed to mislead them concerning the securities issued by the Pittsford Issuers. Moreover, Palazzo and Tackaberry's failure to inform investors of the truth meant that many investors kept their notes and did not seek a redemption longer than they otherwise would have. Further, the promissory notes issued by the Pittsford Issuers and the units issued by Jefferson are undoubtedly "securities" and thus subject to the antifraud provisions of the Securities Act and the Securities Exchange Act. See 15 U.S.C. § 78(c)(10); see also Reves v. Ernst & Young, 494 U.S. 56 (1990) (holding that promissory notes at issue were securities).

Defendants argue that the issue with all of the loans is "whether the defendants possessed an intent to make these loans at the time they sold securities for the respective Pittsford Companies." See Def. Br. at 35. Accordingly, defendants assert that the SEC "has failed to establish fraud in connection with the purchase or sale of securities." See id. at 8-9. However, the defendants arguments fail. The phrase "in connection with" is a term "which Congress expressly intended to define broadly." See U.S. v. Naftalin, 441 U.S. 768, 772 (1970); see also SEC v. Zandford, U.S. 813, 817 (2002) (broker's misappropriation of stock proceeds after sale was "in connection with the purchase and sale of a security"). Here, the SEC's evidence has demonstrated that the fraud prevented investors from redeeming or disposing of the notes by making them believe that Palazzo and Tackaberry were acting consistently with the PPMs. Further, defendants have

failed to meet their burden of proffering evidence sufficient to create a genuine issue of fact for trial on the issue of whether Palazzo and Tackaberry's material misrepresentations and omissions were made in connection with the sale or purchase of securities.

**V.**    **Evidence that Palazzo and Tackaberry Acted With Scienter**

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud." <u>First Jersey Sec., Inc.</u>, 101 F.3d at 1467 (citing <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976)). Scienter may be inferred from proof of "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or from proof that a defendant had "both motive and opportunity to commit fraud." <u>See</u> <u>Rothman v. Gregor</u>, 220 F.3d 81, 89 (2d Cir.2000); <u>see</u> <u>also</u> <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Co.</u>, 75 F.3d 801, 810 (2d Cir. 1996)(Second Circuit held plaintiff may establish scienter by either "(1) identify[ing] circumstances indicating conscious or reckless behavior by the defendants, or (2) alleg[ing] facts showing a motive for committing fraud and a clear opportunity for doing so").

Plaintiff SEC has proffered persuasive evidence that Palazzo and Tackaberry knew they were violating the terms of the PPMs or were reckless in not knowing that they were violating such terms. Palazzo and Tackaberry do not dispute that, as owners and managers of the Pittsford Issuers, they were fully aware of the provisions of each of the PPMs. Nevertheless, both defendants breached the mortgage loan requirement by making loans to Communicate, Monroe Wireless and others. Defendants also knew the prohibition against commingling funds and yet they commingled all the investor funds. Moreover, they failed to provide the Servicing Agent with the necessary information yet knew about all the events of default and

failed to disclose such events to the investors. Palazzo and Tackaberry assert that representations must be determined to have been "false at the time made" and that the SEC only has evidence of "a few incidents" that happened years after the purchase and sale of the securities. See Defs. Br. at 16-17. This argument is misplaced. It is immaterial that some of the defendants' fraudulent conduct occurred after one or more of the Pittsford Issuers offerings. From 1999 to 2006, Palazzo and Tackaberry were engaged in breaching mortgage loan requirements, commingling investor funds, concealing important information from investors designed to lull investors into a false sense of security.[30]

Thus, the Court finds that there is sufficient evidence that Palazzo and Tackaberry knowingly, or at a minimum, recklessly misrepresented material facts to investors and failed to inform investors of material facts affecting their investments.

## VI.   Fifth Amendment Privilege

A party in a civil proceeding has a constitutionally-protected right to assert his privilege against self-incrimination. See United States v. 4003-4005 Fifth Ave., 55 F.3d 78, 82 (2d Cir.1995). However, litigants denied discovery based upon an assertion of the privilege may ask the court to draw a negative inference from the invocation of that right. See Baxter v. Palmigiano, 425 U.S. 308, 318-20 (1976); LiButti v. United States, 107 F.3d 110, 121 (2d Cir.1997); see also SEC v. Martini, et al., 255 F.Supp.2d 268, 282 (S.D.N.Y. 2003). This is because invocation of the privilege necessarily results in a disadvantage to opposing parties by "keep[ing] them from obtaining information they could otherwise get." See 4003-4005

---

[30]Defendants' letters and oral communications for approximately seven years were designed to lull investors to avoid a mass departure from the funds and to stop investors from taking remedial actions. See U.S. v. Jones, 712 F.2d 1316, 1322 (court held that "these notices lulled investors into feeling investments were secure.")

<u>Fifth Ave.</u>, 55 F.3d at 82 (citations omitted). Accordingly, when a party invokes the Fifth Amendment privilege in a civil case, courts may then preclude that party from introducing evidence that was not previously available to his or her adversary due to the party's invocation of the privilege. As this Court has noted "[d]efendant has ... chosen the tactic of seeking to bar plaintiff's access to the evidence .... [T]o the extent of pleading the Fifth Amendment, that is his right. But, in a civil case, he cannot have it both ways. By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to prove them." <u>See</u> <u>SEC v. Benson</u>, 657 F.Supp. 1122, 1129 (S.D.N.Y.1987).

The SEC deposed Palazzo and Tackaberry in October 2006. Both asserted their Fifth Amendment privilege at their respective depositions in response to all substantive questions regarding all of the SEC's claims against them. In addition, notwithstanding the Preliminary Injunction Order's requirement that each of the defendants file and serve "verified written accountings," Tackaberry's Verified Written Accounting states that he "refuses to respond to this inquiry" and exercised his rights under the Fifth and Eighth Amendment to the U.S. Constitution. The SEC has properly requested that the Court draw a negative inference from defendants' invocation of that privilege regarding each of the SEC's claims against Palazzo and Tackaberry. Thus, the Court does draw a negative inference from defendants' assertion of their Fifth Amendment privilege. The defense argues that the request for preclusion and an adverse inference is patently unfair and should the court require additional testimony, defendants "request an opportunity to present *their* testimony via affidavits." <u>See</u> Defs. Br. at 48 (emphasis in original). However, nothing prevented the defendants from providing the Court with sworn declarations opposing the

SEC's summary judgment motion, but they chose not to do so. Thus, the Court does draw a negative inference from defendants' invocation of their Fifth Amendment privilege.

### VII.   <u>Relief Sought in the Complaint</u>

#### A.   Permanent Injunction

Both the Securities Act and the Exchange Act provide for injunctive relief when their provisions have been violated. <u>See</u> 15 U.S.C. §§ 77t(b), 78u(d). Pursuant to those provisions, "a defendant may be permanently enjoined from further violations of either act." <u>See</u> <u>Softpoint, Inc.</u>, 958 F.Supp. at 866. Injunctive relief should be granted "when there is a 'realistic likelihood of recurrence' of the violations, and is appropriate even on summary judgment." <u>Id.</u> at 867 (quoting <u>SEC v. Commonwealth Chem.</u> <u>Secs., Inc.</u>, 574 F.2d 90, 99-100 (2d Cir.1978)). The Second Circuit has directed trial courts to consider certain factors when determining the likelihood of recurrence: "(1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations." <u>Softpoint, Inc.</u>, 958 F.Supp. at 867. The Court concludes, after a thorough analysis of these factors, that a realistic likelihood does exist that defendants' wrongdoing would recur.

As noted above, the SEC has proffered undisputed evidence demonstrating a high degree of scienter. Further, Palazzo and Tackaberry's fraudulent behavior was not limited to an isolated incident but, rather, involved the making of numerous undisclosed loans to Monroe Wireless and Wireless Supply by PCMP to investors in the Pittsford Issuers. Moreover, the SEC has proffered evidence that Palazzo and Tackaberry commingled funds for more than seven years. In addition, Palazzo and Tackaberry have shown

30

no appreciation of the wrongfulness of their actions, and in fact claim that there was no fraud involved and that the Pittsford Entities lost money on investments due to bad business judgments. See Defs. Br. at 5. In fact, Palazzo claims there is due and owing to him $322,000, which he transferred to the entities and for which he was never repaid. See id. Accordingly, there is no reason to assume that defendants lack the wherewithal to engage in a similar scheme again. Thus, Palazzo and Tackaberry are hereby permanently enjoined from committing future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

### B.   Disgorgement

"Disgorgement of illicit profits is a proper equitable remedy for securities fraud." Softpoint, Inc., 958 F.Supp. at 867. Rather than being punitive in nature, "the primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." First Jersey Sec., Inc., 101 F.3d at 1474. Thus, "the proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment." Softpoint, Inc., 958 F.Supp. at 867. The district court is afforded broad discretion in deciding both whether to order disgorgement and in calculating the amount to be disgorged. First Jersey Sec., Inc., 101 F.3d at 1474-75. Further, the amount ordered need only be an approximation of the illicit profits gained. Id. at 1475. In addition, joint and several liability for disgorgement of the entire proceeds of a fraud is required when it is impossible to determine the precise portion of the proceeds that each defendant ultimately took. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).

The SEC asks that Palazzo and Tackaberry be held jointly and severally liable for disgorgement of the proceeds of the fraudulent conduct described in the Complaint. The SEC argues that the total amount to which both defendants should be responsible on a joint and several basis is $11,725,294.82. The defendants argue that the Court is not obliged to accept at face value the amount submitted by the SEC. Further, the defendants assert that the SEC has failed to make any attempts to distinguish any illegally obtained profits in the nearly twelve million dollars it is asking the defendants to disgorge. Here, the SEC has proffered evidence, through issuer records, bank records and investor checks that defendants' fraudulent scheme raised through the Pittsford Issuers offerings is $15,505,294.82 in principal and the total amount redeemed is $3,325,146.86. See Krause Decl. at App. Tabs, 91 and 98. Accordingly, the total amount of principal owed to investors is $11,725,294.82. Defendants have proffered no evidence to contradict or clearly demonstrate that the disgorgement figure is not a reasonable approximation. See SEC v. First City Financial Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989) (Court held that amount was "causally related to the wrongdoing" and is a "reasonable approximation of profits" gained from the violation). Thus, defendants are ordered to disgorge $11,725,294.82.

### C.    Prejudgment Interest

The SEC also seeks an order requiring defendants to pay prejudgment interest. A district court has broad discretion to decide whether to grant prejudgment interest. See First Jersey, 101 F.3d at 1476. In determining whether to grant such an award, a court should examine a number of factors, including "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities

of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Id. (internal citation and quotation marks omitted). The remedial purpose of the statute takes on heightened importance in enforcement actions brought by a regulatory agency. Id. The Court has considered carefully the above-referenced factors and concludes that an award of prejudgment interest is consistent with the remedial purpose of the relevant statutes, and therefore is appropriate here. The IRS underpayment rate is to be used in calculating the prejudgment interest on $11,725,294.82 from June 17, 1996, through the present. See SEC v. Tanner, 2003 WL 21523978, at *2 (S.D.N.Y. 2003) (citing First Jersey Sec. Inc., 101 F.3d at 1476)).

### D.   Civil Monetary Penalty

Both the Securities Act and the Exchange Act provide for civil penalties when their provisions have been violated. See Softpoint, Inc ., 958 F.Supp. at 868; see also 15 U.S.C. §§ 77t(d), 78u(d)(3). Both statutes provide for three tiers of potential penalties; which tier is applicable in a given case depends on the severity of the offense. Id. A third tier penalty, the most severe, is appropriate where the violation of the securities laws involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and where the violation directly or indirectly caused substantial losses to other persons or created a significant risk of substantial losses to other persons. Id. The maximum amount of a third tier penalty shall not exceed the greater of $110,000 against an individual, or the gross amount of pecuniary gain to the defendant. See 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 77t(d)(2)(C). Because civil penalties, similar to a permanent injunction, are imposed in part to deter the wrongdoer from similar future conduct, courts apply the

same factors for deciding injunctive relief in assessing civil penalties. See SEC v. Kane, 2003 WL 1741293 (S.D.N.Y. 2003).

Here, as noted above, the defendants acted with a high degree of scienter; they were trained securities professionals who repeatedly made materially false and misleading statements and omissions to the investors in the Pittsford Issuers. They knew what they were doing and they did it with fraudulent intent. Palazzo and Tackaberry failed to inform investors that they were loaning millions of dollars in investors funds to outside companies contrary to the terms of the PPMs. In addition, they failed to inform investors that they were commingling the offering proceeds. Thus, Palazzo and Tackaberry are hereby assessed a third tier civil penalty in the amount of $75,000 each.

## CONCLUSION

For the foregoing reasons, Plaintiff SEC's motion for summary judgment is granted. Defendants Palazzo and Tackaberry are permanently enjoined from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Palazzo and Tackaberry are jointly and severally directed to disgorge $11,725,294.82 to the SEC, and to pay prejudgment interest beginning June 17, 1996. Defendants are each directed to pay to the SEC a civil penalty of $75,000. The Clerk of the Court is directed to enter judgment in the SEC's favor in accordance with this decision.

ALL OF THE ABOVE IS SO ORDERED.

                              s/Michael A. Telesca
                           MICHAEL A. TELESCA
                        United States District Judge

Dated:    Rochester, New York
          August 23, 2007